Filed 4/20/23  Leyva v. Motorcar Parts of America CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| LEONEL LEYVA,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>MOTORCAR PARTS OF AMERICA, INC. et al.,<br><br>　　　Defendants and Respondents. | B307525<br><br>(Los Angeles County<br>Super. Ct. No. BC718336) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry Green, Judge.  Affirmed in part, reversed in part, and remanded.

Lavi & Ebrahimian, N. Nick Ebrahimian, and Jordan D. Bello for Plaintiff and Appellant.

Lawrence H. Stone; Jackson Lewis and Dylan B. Carp for Defendants and Respondents.

————————————————

Leonel Leyva appeals from a judgment entered after the trial court granted summary judgment in favor of Motorcar Parts of America, Inc. (MPA), and its packing department manager Fred Castillo. After Leyva took time off on an emergency basis to care for his disabled father, MPA terminated Leyva, citing his insubordination regarding Castillo's reassignment of Leyva to a different work task.

Leyva brought claims under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.)[1] for disability-based associational discrimination, failure to prevent discrimination and retaliation, intentional infliction of emotional distress, and wrongful termination based on Leyva's association with his disabled father. Leyva also alleged interference with his right to family care leave and retaliation for his use of family care leave, in violation of the California Moore-Brown-Roberti Family Rights Act (CFRA; §§ 12945.1, 12945.2). The trial court granted summary judgment, finding Leyva failed to establish a prima facie case of disability-based associational discrimination; and Leyva's CFRA claims failed because Leyva declined to take protected leave.

On appeal Leyva contends he raised triable issues of fact showing a prima facie case of associational discrimination and MPA's proffered reason for terminating Leyva (his insubordination) was pretext for unlawful discriminatory animus. Leyva also argues he raised a triable issue whether MPA interfered with his rights under CFRA. We agree there are triable issues and reverse.

---

[1] All further undesignated statutory references are to the Government Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Leyva's Employment with MPA*[2]

MPA operates an automotive parts distribution facility in Torrance, California.  MPA hired Leyva in March 1999 as a general assembly worker.  Leyva later worked as a machine operator, and then in the packing department.

From 1999 until October 2015 Leyva received mostly positive annual performance reviews, rating him "good" or "competent" through 2003 (except for a "poor" rating in attendance in March 2001), and mostly "commendable" in 2004 and 2005.  In his October 2015 annual performance review, MPA ranked Leyva as commendable in work quality and quantity, safety habits, and job knowledge, and outstanding in absences, but unsatisfactory in tardiness.  In an October 2015 reference for Leyva, human resources supervisor Monica Rivero described Leyva as "a reliable, honest, and hard working individual."

Castillo became Leyva's supervisor in 2013.  From that time until December 2015, Castillo was satisfied with Leyva's performance.  In 2015 Leyva began working as a "closer" in the packing department, packaging orders for shipment.  Leyva worked under lead closer Fausto Palafox, who reported to packing department lead Elizabeth Sanchez, who in turn reported to Castillo.  Castillo reported to chief manufacturing officer Douglas Schooner.

Castillo required everyone in his department to sign in and also punch in on the time clock at the start of a work shift.

_____

[2]    The factual background is taken from evidence submitted by the parties in connection with defendants' motion for summary judgment.  We note where the facts are in dispute.

3

Castillo instituted the policy to ensure his employees were at their workstations at the start of their shifts, and not "walking all over the place." According to Castillo, Leyva had been signing in as required since 2013. However, on December 4, 2015 Leyva refused to sign in for his shift. Castillo did not know why Leyva suddenly refused to sign in, and he found Leyva's refusal was insubordinate. Castillo and Leyva met with human resources safety and claims coordinator Elizabeth Ramirez to address the sign-in issue. Castillo explained to Leyva that Leyva was required to sign in, and Leyva agreed to sign in going forward. Ramirez memorialized the meeting in an email to Castillo and Schooner, a copy of which she placed in Leyva's personnel file.

On February 1, 2016 Castillo spoke with Leyva about Leyva's failure to follow Sanchez's directive to work on a specific pallet. A copy of an email from Castillo to Ramirez memorializing the conversation was placed in Leyva's personnel file.

On March 3, 2016 Palafox reported Leyva had used profanity and insults toward him after he asked Leyva to work on a packing list for outgoing orders. Leyva told Palafox he could not do this because he had been asked by Sanchez to do other work. After Palafox requested Sanchez to tell Leyva to work on the packing list, Leyva called Palafox "an asshole" for "crying" that Leyva did "not want to help" Palafox. A coworker overheard the altercation. Castillo emailed Ramirez to report the incident and to request that Leyva be written up.

In a December 16, 2016 email, Castillo informed Ramirez, Sanchez, and Schooner that each day that week Leyva had left at the end of his scheduled shift but "before the orders [were] closed" without informing anyone he was leaving, which he was required

to do.[3]  Further, Leyva refused to follow directions from Palafox to work on certain orders, and Castillo had "caught him going to the bathroom 20 minutes before breaks and lunch."  Castillo had filmed Leyva "not doing anything for an hour."  Castillo stated he "would like to let [Leyva] go and have him replaced with someone that can follow direction and do the hours needed to complete orders for the day."

On December 21 Leyva met with Castillo, Palafox, and Sanchez regarding Leyva's leaving work the prior week without completing daily orders.  Leyva said he did not think MPA needed him to stay late that week because he had been allowed to leave early on Monday of that week.  Leyva was confrontational but agreed to do "what is expected of him."  The next day Ramirez, Schooner, and Castillo met with Leyva in Schooner's office.[4]  Leyva told them he had left at 2:30 p.m. (the end of his scheduled shift) the prior week because he needed to be available for his father, who was in the hospital.  According to Leyva, his father was suffering from serious health ailments, including diabetes, lung and kidney disease, and prostate cancer.  Leyva said at the December 22 meeting that he had told a coworker named Lupito to tell Castillo that Leyva was leaving early because of his father.  Castillo testified that Lupito never told him that Leyva was leaving work early to take care of his sick father, and Castillo did not learn this until the meeting.

---

[3]  Ramirez testified MPA required Leyva, as a closer, to work mandatory overtime when necessary to complete the day's orders.

[4]  Leyva testified human resources supervisor Monica Rivero was also present at the meeting.

According to Schooner, MPA had considered disciplining Leyva on December 21, but Leyva "was not reprimanded for that time frame once [Ramirez, Schooner, and Castillo] found out about his dad" at the December 22 meeting. Leyva was told to let MPA know his needs and MPA would "work with [Leyva] on that." Ramirez offered to set up a meeting between Leyva and Rivero "to discuss FMLA"[5] if he needed time to take care of his father. Leyva was also told to communicate with his manager and the lead closer if he could not stay for overtime and to ask Palafox before the scheduled end of the shift whether he needed to stay late. On December 27 Ramirez wrote a memorandum to Leyva's file memorializing the December 22 meeting.

On December 28 Rivero met with Leyva to discuss family care leave. Rivero informed Leyva he could take an unpaid leave of absence to care for his father. Rivero "prepared FMLA documents" and gave Leyva a leave of absence request form, a vacation request form, and pamphlets on the California Employment Development Department's paid family leave program.[6] Leyva told Rivero "he had bills to pay" and so he would not "actually [be] taking the FMLA [leave]." Rivero told Leyva he could use vacation time instead to take time off when necessary to visit his father.

---

[5] FMLA refers to the Family and Medical Leave Act of 1993 (29 U.S.C. §§ 2601-2654), which contains provisions analogous to CFRA. (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 487; *Dudley v. Department of Transp.* (2001) 90 Cal.App.4th 255, 261.)

[6] At his deposition, Leyva could not remember whether Rivero shared any paperwork with him at the meeting.

B.      *Leyva Takes Time Off To Care for His Father*

Leyva was aware that MPA had a process for requesting time off. He was required to inform his supervisor (Castillo) and to inform Rivero or Ramirez in human resources. In late 2016 and early 2017 Leyva took three days off work using his accrued vacation time to care for his father during medical emergencies. Leyva testified that his father was hospitalized from December 22, 2016 until December 25 or 26, 2016. Leyva took December 27 off from work and submitted a written time off request on January 4, 2017, which Castillo approved the same day. Leyva's father was again hospitalized from January 22 through 25. Leyva took January 23 off from work and submitted a written time off request two days later, which Castillo again approved. Leyva then took February 17 off from work and submitted a written time off request on February 27, which Castillo approved the same day.[7] None of Leyva's time off requests was denied. When Leyva was absent, Castillo worked around the staffing shortage by "grab[bing] somebody from the cell [to] help me out at the end of the . . . shift."

In each instance, on the same day Leyva learned of his father's medical emergency, Leyva informed Castillo he would be absent that day. Leyva testified he told Castillo each time that he had to take time off to care for his father, and Castillo told him to speak with human resources. Leyva could tell Castillo was "annoyed" by the "angry" look on Castillo's face when he asked for time off, as well as his body language in that "sometimes [Leyva] was talking to him and then he would turn his back and leave."

---

[7]     Leyva also took a sick day on February 21, 2017, which Castillo approved on February 27.

7

Leyva explained further that Castillo would give him "an upset stare. Like his face and then he would turn around and leave me talking to myself. Like it was disrespectful."

C.    *Leyva's Termination*

On February 27, 2017 (the same day Castillo approved Leyva's third request for time off to care for his father), Castillo informed Leyva he would be moving to a different work area to train for a different task—instead of packing alternators, Leyva would pack wheel hubs. Leyva became upset and responded that he did not remember how to do it. According to Castillo, Leyva threatened to sue if he was moved. Castillo and Leyva met with Rivero to discuss Leyva's refusal to change positions. Rivero summarized the meeting in a memorandum to Leyva's file. According to the memorandum, during the meeting Leyva asserted Castillo was only moving him because he had "been out" to care for his father. Castillo said the move was due to production necessities, not Leyva's absences. Rivero informed Leyva he was "simply being moved within his department to perform different tasks," that reassignment was standard practice for training and meeting production requirements, and Leyva's refusal was insubordination. According to Rivero and Castillo, Leyva then requested to be transferred to the quality control department. Rivero told Leyva to continue working in packing until his transfer request was approved. Leyva denied that he ever asked for a transfer.

According to Castillo, closers underwent cross-training for different tasks when needed, and Castillo had requested at least two other closers change tasks in the packing department in or around February 2017. Castillo had no particular reason for

8

choosing Leyva for the reassignment rather than another employee. Palafox testified, however, that he never saw Castillo ask any of the other closers who reported to Palafox to go work or train in a different department.

The parties dispute the events of February 28, 2017. Leyva testified he reported to work at around 6:00 a.m. as scheduled and performed packing and shipping work for about an hour. At around 7:00 a.m. the head of security, Jaime Galvan, approached Leyva and told him that Castillo had ordered him to remove Leyva from the worksite. After Galvan escorted him outside, Leyva waited around to discuss the situation with Rivero or Ramirez. At around 8:30 or 9:00 a.m. Leyva saw Rivero and Ramirez arriving to work and approached them. Leyva asked them why Castillo had "taken [him] out of the company" and requested to speak with Schooner. Rivero and Ramirez did not know why Leyva was removed and told Leyva to return in the afternoon to meet with Schooner.[8]

Castillo testified that on the morning of February 28 between 6:00 and 7:00 a.m. Sanchez called Castillo and reported Leyva was not engaging in training for his newly assigned tasks, and instead was standing with his hands in his pockets and was not picking up boxes. Castillo told Sanchez to direct Leyva to train. A few minutes later, Castillo called Sanchez for an update. Sanchez replied that Leyva told her he was working but continued to stand with his arms crossed. This was why Castillo directed Galvan to escort Leyva outside. Castillo also contacted Schooner to tell him what was happening and filed an incident

---

[8]     Rivero denied she spoke with Leyva on the morning of February 28, 2017.

9

report. Sanchez also submitted an incident report that day stating she observed Leyva "not working." Palafox likewise submitted an incident report stating Leyva did not work in his department, but he observed Leyva standing "with his arms crossed."

Ramirez first learned from Galvan that Leyva had been escorted from the building for refusing to work. When Ramirez arrived to work sometime before 9:00 a.m., she saw Leyva waiting in the parking lot. She brought Leyva into her office. Leyva told Ramirez he did not want to work in packing and the quality control department had approved his transfer. Ramirez "explained the transfer process" to Leyva and "asked him to go back to his workstation several times." Leyva responded, "'If you don't transfer me, then fire me.'" Ramirez explained that if Leyva walked off the job, this would be treated as his resignation, and she urged him to return to his workstation. Leyva told Ramirez he was leaving, but he asked Ramirez to set up a meeting with Schooner. Ramirez wrote a memorandum to Leyva's file summarizing the meeting.

Later that day Rivero, Ramirez, and Schooner met to discuss Leyva.[9] Rivero testified that she told Schooner what had happened the prior day and that morning, and in response Schooner stated he was "'making the decision to terminate Mr. Leyva.'" Schooner instructed Rivero and Ramirez to prepare termination paperwork and a final paycheck.

At around 3:00 p.m. that afternoon, Leyva met with Schooner, Castillo, Rivero, and Ramirez in Schooner's office.

---

[9]     Rivero could not remember whether the discussion took place in person or by phone or email.

According to Leyva, Schooler said, "'You're fired,'" but he did not give an explanation. At that point Rivera provided Leyva a check, and Leyva said "'thank you.'" Leyva left without asking why he was being terminated. Schooner testified that Leyva was told he was insubordinate for refusing to work and Schooner would not "transfer a problem to another department." According to Rivero, Schooner told Leyva he needed to follow directions and move to another area to meet the company's needs.

Castillo testified Leyva resigned. Similarly, Schooner in his deposition denied making any decision to terminate Leyva and testified Leyva "self-terminated," in that "[h]e refused to work and he quit." However, Leyva's final paycheck indicated Leyva's employment ended due to "involuntary termination," and MPA issued a termination notice to Leyva, signed by Castillo, stating Leyva was dismissed involuntarily for "insubordination."

D.    *Leyva's Complaint*

On August 17, 2018 Leyva filed this action against MPA and Castillo alleging, among other things, MPA terminated him because of his association with his disabled father and in retaliation for his use of medical leave. Leyva's operative first amended complaint alleged causes of action against MPA for (1) associational discrimination in violation of FEHA based on disability; (2) failure to prevent discrimination and retaliation; (3) interference with his right to leave in violation of CFRA; (4) retaliation in violation of CFRA based on his request for or use of medical leave; (5) wrongful termination in violation of public policy; and (6) intentional infliction of emotional distress. Only Leyva's sixth cause of action for intentional infliction of emotional distress was alleged against Castillo.

11

Leyva alleged MPA interfered with his rights under CFRA by refusing to provide protected leave, failing to designate his time off as protected leave, and failing to reinstate him after his leave ended. As to his wrongful termination claim, Leyva alleged MPA violated the public policies embodied in FEHA and CFRA.

E.    *Defendants' Motion for Summary Judgment*

On November 20, 2019 MPA and Castillo filed a motion for summary judgment or, in the alternative, summary adjudication. In support of their motion, defendants submitted deposition testimony, declarations, and other evidence relating to Leyva's employment and time off. Defendants argued Leyva's discrimination claim failed because Leyva was not qualified for his position given his history of insubordination; Leyva could not establish MPA was motivated to terminate Leyva due to his father's disability because his insubordination predated his time off to care for his father; and MPA had a legitimate, nondiscriminatory business reason for its actions, namely, Leyva's insubordination, which Leyva could not show was pretextual.

As to Leyva's CFRA interference claim, defendants argued Leyva declined to take the protected leave of absence MPA offered to him and received the time off he requested. Leyva's CFRA retaliation claim failed because Leyva could not show he engaged in protected activity or establish MPA's termination of Leyva was caused by his protected activity because Leyva declined to take the CFRA leave offered to him and MPA approved his requests for time off. Further, MPA had a legitimate, nondiscriminatory business reason for its actions, namely, Leyva's insubordination, which Leyva could not show

12

was pretextual. Leyva's claim for wrongful termination failed because MPA did not violate FEHA or CFRA in terminating Leyva. Leyva's intentional infliction of emotional distress claim failed because without an actionable discrimination or retaliation claim, Leyva could not show defendants' conduct was extreme or outrageous. Defendants also moved for summary adjudication of Leyva's request for punitive damages, arguing Leyva could not show by clear and convincing evidence any officer, director, or managing agent of MPA engaged in or authorized conduct constituting oppression, fraud, or malice.

Defendants attached copies of Leyva's approved time off requests from December 2016 through February 2017 and memoranda to Leyva's employment file. Defendants attached excerpts from the deposition testimony of Schooner, Castillo, Rivero, and Ramirez and declarations by Ramirez, Sanchez, Palafox, Galvan, and others. Defendants also submitted excerpts from Leyva's November 15, 2017 deposition in a workers' compensation matter, in which Leyva testified he believed his supervisor was upset when he asked for time off because "[h]e would never talk" to Leyva but would send him to speak with human resources. Asked "did anyone tell you that you were taking too many times off work in the last month," Leyva responded, "Yes. My supervisor." Asked exactly what the supervisor told Leyva, Leyva stated, "That I was missing too much." When he was again asked exactly what the supervisor said, Leyva responded, "No. He didn't tell me anything, but due to his behavior" of always watching Leyva's work, Leyva believed his supervisor was upset when he asked for time off. Leyva was again asked whether his supervisor "actually approached [Leyva]

13

and said that he wasn't happy with your absence." Leyva replied, "No. He never approached me."

In his opposition, Leyva argued there were disputed questions of material fact whether MPA terminated him based on his father's disability or in retaliation for taking medical leave under CFRA. Leyva submitted excerpts from the depositions of Castillo and Palafox, which he asserted showed Castillo singled him out for disparate treatment by reassigning him to a different department on February 27, 2017. Leyva also submitted excerpts from his April 18, 2019 deposition in this action, in which Leyva testified Castillo came to Leyva's work area on February 27 and told Leyva that "he was maybe going to fire me because of the days that I was requesting frequently to go and take care of my father about the cancer and all the other illnesses." Leyva argued Castillo's statements constituted direct evidence of discriminatory animus, and further, the timing of his termination one day after Castillo approved his third emergency request for time off to care for his father showed MPA's proffered nondiscriminatory reason for termination was pretextual. Further, Leyva was a 17-year employee of MPA with predominantly positive performance reviews. Castillo's negative response to Leyva's requests for time off showed pretext. MPA's narrative regarding Leyva's termination was inconsistent and implausible, alternately characterizing the end of Leyva's employment as a resignation and a termination. Leyva also disputed he ever requested a transfer or refused to work. Leyva asserted MPA interfered with his rights under CFRA by terminating him for requesting or taking protected leave and by failing to inform him in writing of his rights under CFRA. As to his intentional infliction of emotional distress claim, Leyva

14

argued triable issues existed whether defendants' outrageous conduct caused Leyva severe emotional distress.

Leyva submitted MPA's response to a form interrogatory, in which defendants admitted Leyva was terminated, but in explaining the reasons for the termination, stated Leyva "resigned his employment on February 28, 2017." MPA's response also described how Leyva was "insubordinate" in that he refused to cross-train or to return to work. MPA admitted that Castillo, Rivero, and Schooner provided information relied upon in the termination decision.

In their reply,[10] defendants argued Leyva had not raised a triable issue of fact whether Castillo told Leyva he may be fired for taking too much time off in light of Leyva's earlier deposition testimony in the workers' compensation matter that Castillo "never made any comments to him about missing time from work to care for his father." Defendants argued Leyva could not contradict his earlier deposition testimony to avoid summary judgment, citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.

F.      *The Trial Court's Ruling*

After a hearing, on February 20, 2020 the trial court granted summary judgment in favor of defendants. The court ruled Leyva's claim for associational discrimination under FEHA failed because Leyva had not shown a prima facie case for relief. The court reasoned the proximity in time between Leyva's time off to care for his father and MPA's decision to terminate Leyva

---

[10]     On our own motion we augment the record to include defendants' January 31, 2020 reply in support of motion for summary judgment. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

"proves nothing here" because Leyva "only took vacation which was already part of his employment bargain." The court found Leyva had failed to "explain[ ] what Defendants had to gain by firing him which they wouldn't gain by firing anyone else who took vacation." The court dismissed Leyva's "speculations about the meaning behind Castillo's facial expressions." The court found Leyva's deposition testimony that Castillo approached him and told him he might be fired for taking time off did not create a triable issue of fact because Castillo did not "actually fire[ ]" Leyva (Schooner did), the comment by Castillo was "something out of caricature" in "mirroring the language used to set forth an element of this claim," and in Leyva's earlier deposition taken in his workers' compensation case, Leyva denied Castillo said anything to him about taking time off. For this reason the court disregarded Leyva's deposition testimony.

The trial court found Leyva's claims for interference and retaliation in violation of CFRA failed because Leyva declined to take protected leave. The court concluded Leyva's claims for wrongful termination, intentional infliction of emotional distress, and failure to prevent discrimination and retaliation also failed because the claims were derivative of his other claims.

On May 22, 2020 the trial court entered judgment for defendants. Leyva timely appealed.

16

## DISCUSSION

A.      *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668.)  "'"""We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."'  [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'"""  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Doe*, at p. 669; *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1068.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Sabetian v. Exxon Mobil Corporation, supra*, 57 Cal.App.5th at p. 1068.)  If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Sabetian*, at p. 1069.)  "The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that

17

a triable issue of material fact exists."  (Code Civ. Proc., § 437c, subd. (p)(2); accord, *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1054 ["It is fundamental that to defeat summary judgment a plaintiff must show 'specific facts' and cannot rely on allegations of the complaint."];  *Regional Steel Corp. v. Liberty Surplus Ins. Corp.* (2014) 226 Cal.App.4th 1377, 1388.)

In evaluating claims of discrimination under FEHA, California courts apply the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)  The same approach is applied in evaluating claims of retaliation under FEHA and CFRA.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [applying *McDonnell Douglas* burden-shifting to claim of retaliation under FEHA]; *Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th 546, 560 ["CFRA retaliation claims . . . are subject to the *McDonnell Douglas* burden-shifting analysis [citation]."].)

Under this approach, if the plaintiff establishes a prima facie case supporting his or her discrimination or retaliation claim, the burden shifts to the employer to rebut the presumption of discrimination or retaliation by offering a legitimate, nondiscriminatory reason for the adverse employment action. (*Harris v. City of Santa Monica, supra*, 56 Cal.4th at p. 214; *Guz, supra*, 24 Cal.4th at p. 355.)  An employer may meet its initial burden in moving for summary judgment or adjudication of an employment discrimination or retaliation cause of action by presenting evidence that one or more elements of a prima facie case is lacking, or the employer acted for a legitimate,

nondiscriminatory reason. (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181; *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158; *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 591 (*Soria*).) A legitimate, nondiscriminatory reason is one that is unrelated to the prohibited bias and, if true, would preclude a finding of discrimination or retaliation. (*Guz*, at p. 358.) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally.*" (*Ibid.*)

If the employer satisfies its initial burden, the burden shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer's stated reason was a pretext for unlawful animus in order to avoid summary judgment or adjudication. (*Husman v. Toyota Motor Credit Corp., supra,* 12 Cal.App.5th at p. 1182; *Featherstone v. Southern California Permanente Medical Group, supra,* 10 Cal.App.5th at pp. 1158-1159; *Soria, supra,* 5 Cal.App.5th at p. 591.) "The plaintiff's evidence must be sufficient to support a reasonable inference that discrimination [or retaliation] was a substantial motivating factor in the decision. [Citations.] The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory [or retaliatory] motive." (*Featherstone*, at p. 1159; see *Soria*, at p. 591 [plaintiff must produce ""substantial responsive evidence" that the employer's showing was untrue or pretextual"].)

To meet his or her burden, the plaintiff may present evidence showing the stated reason by the employer was "unworthy of credence" as circumstantial evidence of pretext. (*Guz, supra*, 24 Cal.4th at p. 361; see *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147 ["In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."].) However, in order to prevail, a plaintiff must present evidence to support a rational inference that intentional discrimination or retaliation, "on grounds prohibited by the statute, was the true cause of the employer's actions." (*Guz*, at p. 361, italics omitted; accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 863 [""the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence""""].)

B.    *Leyva Raised a Triable Issue of Fact as to His FEHA Disability Discrimination Claim*

FEHA prohibits an employer from subjecting an employee to an adverse employment action based on the employee's protected status, including his or her physical disability. (§ 12940, subd. (a).) FEHA defines a "physical disability" to include "a perception . . . that the person is associated with a person who has, or is perceived to have" a physical disability. (§ 12926, subd. (o).) "Accordingly, when FEHA forbids discrimination based on a disability, it also forbids discrimination based on a person's association with another who has a disability." (*Castro-Ramirez v. Dependable Highway Express, Inc.*

20

(2016) 2 Cal.App.5th 1028, 1036 (*Castro-Ramirez*); accord, *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 656-657 (*Rope*), superseded by statute on another ground.)

To prevail on his FEHA disability discrimination claim, Leyva needed to show "(1) he was a member of a protected class; (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355; accord, *Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1037.) "Adapting this framework to the associational discrimination context, the 'disability' from which the plaintiff suffers is his or her association with a disabled person." (*Castro-Ramirez*, at p. 1037; see *Rope, supra*, 220 Cal.App.4th at p. 658.) As to a discriminatory motive, "the disability must be a substantial factor motivating the employer's adverse employment action." (*Castro-Ramirez*, at p. 1037.) It is undisputed Leyva has shown an association with a disabled person—his ailing father. However, the parties disagree as to whether Leyva has shown his association with his disabled father was a substantial factor motivating MPA's termination of Leyva's employment.

MPA argues Leyva has failed to prove a prima facie case of associational discrimination because he has not shown circumstances suggesting MPA had any motive to discriminate against him as a non-disabled employee for his association with his disabled father. MPA asserts there is no evidence of animus given that Leyva used accrued vacation time to care for his father, imposing no greater burden than any other similarly situated employee using vacation time. We are not persuaded.

A plaintiff may make out a prima facie case of disability-based associational discrimination by submitting evidence "'the employer [had] a motive to discriminate against a nondisabled employee who is merely associated with a disabled person,'" for example, by showing the employer viewed the employee's association as an expense, a distraction, or a disability by association. (*Castro-Ramirez, supra*, 2 Cal.App.5th at pp. 1041-1042; see *Rope, supra*, 220 Cal.App.4th at p. 657.) Leyva raised a triable issue of fact whether Castillo, and through him MPA, viewed Leyva's need for time off to care for his father as a distraction and an inconvenience. (See *Castro-Ramirez, supra*, 2 Cal.App.5th at p. 1043 [evidence employee's supervisor refused to schedule employee's routes to allow him to administer his son's dialysis raised reasonable inference supervisor "wanted to avoid the inconvenience and distraction" posed by employee's need to care for his disabled son]; *Rope, supra*, 220 Cal.App.4th at p. 658 [evidence employer terminated employee two days before he was scheduled to take paid leave to donate kidney to his physically disabled sister supported reasonable inference employer "acted preemptively to avoid an expense stemming" from employee's association].)

Leyva's time off requests, though processed and approved as requests to use paid accrued vacation time, were made on an emergency basis and on the same day as the requested time off. Leyva took time off three times in the three months before his termination on an emergency basis. Further, there was evidence the last minute requests placed a burden on MPA. While Castillo's December 16, 2016 email to Schooner, Ramirez, and others, in which Castillo requested to replace Leyva with "someone that can follow direction and do the hours needed to

22

complete orders for the day," predated Castillo's knowledge that Leyva's absences were to help care for his father, the email nonetheless provides evidence of the burden Leyva's need for time off imposed on operations. Castillo's complaint that Leyva's coworkers were "complaining of picking up his part of the work" illustrates the inconvenience caused by Leyva's need for time off on an emergency basis. In addition, when Leyva was absent, Castillo had to rearrange labor on the work floor by "grab[bing] somebody from the cell [to] help [Castillo] out at the end of the . . . shift." And Schooner testified MPA was "short people" at the time Leyva was terminated, supporting an inference MPA was also short staffed while Leyva was requesting emergency time off just days and weeks earlier. In addition, the temporal proximity between Leyva's time off requests and MPA's termination decision (on the day after Castillo approved Leyva's third emergency request for time off to care for his father), provides further support for Leyva's prima facie case. (*Doe v. SoftwareONE Inc.* (2022) 85 Cal.App.5th 98, 111; *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353 ["the temporal proximity between an employee's disclosure of his symptoms and a subsequent termination may satisfy the causation requirement at the *first step* of the burden-shifting process"].)

MPA contends that even if Leyva showed a prima facie case of associational discrimination, he has not shown MPA's proffered legitimate, non-discriminatory business reason for the termination (Leyva's insubordination) was pretext for discriminatory animus. Leyva argues he has raised a triable

23

issue of pretext[11] based on Castillo's singling Leyva out for reassignment on the same day Castillo approved Leyva's third emergency request for time off to care for his father (the day before MPA terminated Leyva), Leyva's testimony he was working as usual on the day of his termination when he was led out of the building by security at Castillo's order, and the MPA decision makers' differing accounts as to whether Leyva resigned or was fired. Leyva has the better argument.

MPA argues Leyva's testimony that Castillo was visibly annoyed and angry each time Leyva requested emergency time off to care for his father does not create a triable issue of fact with respect to pretext because Leyva's statements as to Castillo's state of mind are speculative. Leyva testified Castillo looked angry and turned his back on Leyva while Leyva was still speaking. This testimony describing how Castillo looked when Leyva made a time off request was admissible as a lay opinion to show Castillo was angered by Leyva's requests. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1309-1311 [percipient witness's testimony his cellmate "remained silent and did not appear angry" when asked to take blame for defendant's crimes was proper lay opinion evidence]; *People v. DeHoyos* (2013) 57 Cal.4th 79, 130 ["A lay witness generally may not give an opinion about

---

[11] Because we conclude Leyva raised a triable issue of fact whether MPA's proffered reason for terminating him was pretext, we do not reach Leyva's argument under *D'Amico, supra*, 11 Cal.3d 1 that the trial court erred in disregarding Leyva's direct evidence of discriminatory animus—Leyva's deposition testimony that the day before his termination Castillo told him that Castillo might have him fired for taking time off—because it was inconsistent with Leyva's prior deposition testimony.

another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind."]; *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 113 ["[A] lay witness may express an opinion that a person was 'drunk' [citation], or that people engaged in a discussion were 'angry' [citation], or that an impact was strong enough to jar a passenger from a seat [citation], or that someone appeared to be 'trying to break up a fight.'"]; see also Evid. Code, § 800 ["If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: (a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony."].) Thus, a reasonable jury could find from Leyva's testimony that Leyva's emergency time off requests angered Castillo.

Leyva's evidence that Castillo singled Leyva out among MPA's packing department closers for reassignment the day before Leyva's termination further supports Leyva's position Castillo viewed Leyva's time off needs as a burden. Although Castillo testified he had requested at least two other closers to change tasks in or around February 2017, Palafox, who was the only lead closer in the packing department, testified he had never seen Castillo ask any of the closers who reported to Palafox to work or train in a different department. Further, Castillo testified he had no particular reason for choosing Leyva for the reassignment instead of another employee. Thus, there is a triable issue of fact whether Castillo's request that Leyva change tasks was standard practice or targeted to provoke Leyva into giving Castillo a reason to terminate him for his time off requests. (See *Castro-Ramirez, supra*, 2 Cal.App.5th at p. 1043

25

[triable issue of pretext where supervisor "engineered a situation in which plaintiff would refuse to work the shift, giving [the supervisor] reason to terminate him"].)

We reject MPA's argument Castillo's conduct is irrelevant because Schooner, not Castillo, made the ultimate decision to terminate Leyva. "[A] plaintiff 'need not demonstrate that every individual who participated in the failure to hire [or terminate] him shared discriminatory animus.' [Citation.] Rather, 'showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus.'" (*Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 743 [supervisor's discriminatory animus could be imputed to employer where supervisor falsely told plaintiff that employer had no job openings, and supervisor was involved in hiring process, although she had no hiring authority]; accord, *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 542 ["'If [the formal decision maker] acted as the conduit of [an employee's] prejudice—his cat's paw—the innocence of [the decision maker] would not spare the company from liability.'"]; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 937 [animus of private club's general manager toward plaintiff was properly imputed to employer where manager discussed events precipitating termination with decision makers and was present at plaintiff's termination]; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 100, 113 [reversing summary judgment for employer where evidence raised triable issues of fact whether decision maker's action was induced by retaliatory motives of intermediate managers].)

26

Leyva presented evidence from which a trier of fact reasonably could infer Castillo influenced MPA's decision to terminate Leyva. Castillo directly participated in the decision to terminate Leyva in several ways. Castillo, not Schooner, ordered security to remove Leyva from his workstation the day Leyva was terminated. And on the same day Castillo conferred with Schooner by phone regarding the termination decision, then participated in the meeting with Schooner, Ramirez, Rivero, and Leyva. Further, Castillo, not Schooner, signed the termination notice MPA issued to Leyva. In addition, defendants admitted in response to a form interrogatory that Castillo provided information relied upon in the termination decision. And Schooner denied ordering Leyva be fired.

MPA's contention that Leyva forfeited this argument by failing to raise the "cat's paw doctrine" in the trial court lacks merit. Although Leyva did not use the words "cat's paw" below, he adequately argued and submitted evidence Castillo harbored discriminatory animus and influenced MPA's termination decision.

Finally, the parties dispute the events of February 28, 2017, the day on which MPA terminated Leyva. Leyva testified he reported to work at around 6:00 a.m. that day as scheduled and performed packing and shipping work for about an hour before Galvan removed him from the worksite at Castillo's order. MPA's witnesses testified Leyva was taken to another department to train in newly assigned duties, but Leyva refused to work and was therefore ejected from the worksite. If the jury were to believe Leyva's version of events that he was not insubordinate in refusing to work on February 28, that would

tend to show MPA's proffered reason for terminating Leyva was pretextual.

Considering Leyva's evidence of pretext together with the close temporal proximity between Leyva's use of time off to care for his father and MPA's termination of his employment on the day after he submitted his third time off request for approval, Leyva has raised a triable issue of fact whether MPA's proffered reason for terminating him was pretext for disability-based associational discrimination under FEHA. Accordingly, we reverse the trial court's order granting summary adjudication of Leyva's FEHA discrimination claim.[12]

C.    *Leyva Raised a Triable Issue of Fact as to His CFRA Interference Claim*

CFRA "'is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.'" (*Soria, supra*, 5 Cal.App.5th at p. 600; accord, *Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 233.) CFRA provides that a qualified employee of an employer with five or more employees may take up to 12 weeks of family care and medical leave in any 12-month period. (§ 12945.2, subds. (a), (b)(3)(A).)

---

[12]    Because we conclude the motion for summary judgment was not properly granted, we analyze each cause of action separately with respect to defendants' motion for summary adjudication. Defendants concede Leyva's second cause of action for failure to prevent discrimination and retaliation under FEHA survives summary adjudication if there is a triable issue of fact as to Leyva's underlying FEHA associational discrimination claim. There is.

Under CFRA, it is "an unlawful employment practice for an employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this section." (§ 12945.2, subd. (q); Cal. Code Regs., tit. 2, § 11094, subd. (b).) "A CFRA interference claim "'consists of the following elements: (1) the employee's entitlement to CFRA leave rights; and (2) the employer's interference with or denial of those rights."'" (*Soria, supra*, 5 Cal.App.5th at p. 601; accord, *Moore v. Regents of University of California, supra*, 248 Cal.App.4th at p. 250.) "An interference claim under CFRA does not invoke the burden shifting analysis of the *McDonnell Douglas* test." (*Moore*, at p. 250; accord, *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 879.) Under regulations promulgated pursuant to CFRA, "Any violation of CFRA or these implementing regulations constitutes interfering with, restraining, or denying the exercise of rights provided by CFRA." (Cal. Code Regs., tit. 2, § 11094, subd. (a).)

"Employers subject to the CFRA are required to provide notice to their employees of the right to request CFRA [leave]." (*Faust v. California Portland Cement Co., supra*, 150 Cal.App.4th at p. 879; see Cal. Code Regs., tit. 2, § 11095 ["Every employer covered by the CFRA . . . is required to post and keep posted on its premises, in conspicuous places where employees are employed, a notice explaining the Act's provisions . . . ."].) "'Under all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as CFRA or CFRA/FMLA qualifying, based on information provided by the employee . . . , and to give notice of the designation to the employee.'" (*Soria, supra*, 5 Cal.App.5th at pp. 602-603, quoting Cal. Code Regs., tit. 2, § 11091, subd. (a)(1)(A).) "'Whether notice is sufficient

under CFRA is a question of fact.'" (*Soria*, at p. 603; accord, *Bareno v. San Diego Community College Dist.*, *supra*, 7 Cal.App.5th at p. 565.)

The CFRA regulations provide further, "Upon granting the CFRA leave, the employer shall inform the employee of its guarantee to reinstate the employee to the same or a comparable position, subject to the defenses permitted by section 11089(d), and shall provide the guarantee in writing upon request of the employee." (Cal. Code Regs., tit. 2, § 11089, subd. (a)(1).)

Leyva asserts MPA interfered with his rights under CFRA by terminating him for his attempt to take CFRA-protected leave. MPA does not dispute Leyva was entitled to CFRA-protected leave to care for his father, but it contends Leyva failed to raise a triable issue of fact because Leyva declined to take protected leave and MPA approved Leyva's vacation time off requests. Again, MPA's argument lacks merit.

MPA misapprehends the protections provided by CFRA. Under section 12945.2, subdivision (d), an employee taking CFRA-protected leave "may elect, or an employer may require the employee, to substitute, for leave allowed under subdivision (a), any of the employee's accrued vacation leave or other accrued time off during this period or any other paid or unpaid time off negotiated with the employer." Thus, MPA's position (adopted by the trial court) embraces a false dichotomy in which Leyva was entitled to protected unpaid leave, but his use of accrued vacation time transformed his leave into unprotected paid leave. This is contrary to CFRA's express authorization of use of accrued vacation time during a period of protected leave. Therefore, Leyva's requests for time off to care for his disabled father were requests for protected leave irrespective of Levya's election to use

30

accrued vacation time to be paid for the time off.[13]  Moreover, "'[u]nder all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as CFRA or CFRA/FMLA qualifying, based on information provided by the employee . . . , and to give notice of the designation to the employee.'" (*Soria, supra*, 5 Cal.App.5th at pp. 602-603, quoting Cal. Code Regs., tit. 2, § 11091, subd. (a)(1)(A).)  Based on the information provided by Leyva—that he needed time off to care for his seriously ill father—MPA was required to designate the leave as CFRA-qualifying and give Leyva notice.  Thus, a triable issue of fact exists whether MPA interfered with Leyva's CFRA rights by failing to offer Leyva the option of paid CFRA-protected leave by using his accrued vacation time.

Further, as discussed, Leyva has presented evidence raising a triable issue of fact whether MPA unlawfully discriminated against him by terminating him for association with his disabled father.  If Leyva proves MPA acted with discriminatory animus in terminating his employment (for taking time off to care for his father), there is necessarily a question of fact whether Leyva was terminated for his use of protected leave.

Likewise, if Leyva proves Castillo selected him for reassignment due to his use of family care leave with the intent to create a reason to terminate him, Leyva will have shown MPA interfered with his rights under CFRA. (See Cal. Code Regs.,

---

[13]     Section 12945.2, subdivision (b)(5)(B), defines "'[f]amily care and medical leave'" to include "[l]eave to care for a . . . parent . . . who has a serious health condition."  It is undisputed Leyva's time off to care for his father was for a qualifying CFRA purpose.

31

tit. 2, § 11094, subd. (a)(1) [actionable interference includes an employer "[c]hanging the essential functions of the job in order to preclude the taking of leave"].)  And it is actionable interference for an employer to "[t]erminat[e]  an employee when it anticipates an otherwise eligible employee will be asking for a CFRA-qualifying leave in the future."  (*Id.*, tit. 2, § 11094, subd. (a)(3); see *id.*, subd. (b) ["CFRA's prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise CFRA rights . . . ."].)  For these reasons, the trial court erred in granting summary adjudication of Leyva's CFRA interference claim.[14]

D.    *Leyva Raised a Triable Issue of Fact as to His Wrongful Termination Claim*

"The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm."  (*Yau v. Allen* (2014) 229 Cal.App.4th 144, 154; accord, *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641.)  "The

---

[14]    Defendants are correct, however, that Leyva has forfeited any argument the trial court erred in granting summary adjudication of his cause of action for retaliation under CFRA by failing to raise it in his briefs on appeal.  (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72 [""'Issues not raised in an appellant's brief are [forfeited] or abandoned.'""]; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [same].)

central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 702; see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176.) Protected conduct includes exercising a statutory right or privilege. (*Yau*, at p. 155.) As discussed, Leyva raised a triable issue on his claims MPA violated FEHA and CFRA in terminating him. Thus, the trial court erred in granting summary adjudication of Leyva's wrongful termination claim.

E. *Leyva Raised a Triable Issue of Fact as to His Intentional Infliction of Emotional Distress Claim*

"A cause of action for intentional infliction of emotional distress exists when there is """"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiffs' suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.""""" [Citations.] A defendants' conduct is 'outrageous' when it is so """extreme as to exceed all bounds of that usually tolerated in a civilized community."" [Citation.] And the defendant's conduct must be """intended to inflict injury or engaged in with the realization that injury will result."""" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051, quoting *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; accord, *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) "'[B]ehavior may be considered outrageous if a defendant . . . abuses a relation or position which gives him

power to damage the plaintiff's interest . . . .'" (*Smith v. BP Lubricants USA Inc.* (2021) 64 Cal.App.5th 138, 147; accord, *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946, disapproved on other grounds by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574 fn. 4.) "[W]hether conduct is outrageous is "'usually" a question of fact.'" (*Smith*, at p. 148; accord, *Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 356.)

As defendants concede, the viability of Leyva's intentional infliction of emotional distress claim depends on whether Leyva has raised a triable issue of fact that Castillo and MPA intentionally discriminated against him or interfered with his CFRA rights. Liberally construing the evidence in support of Leyva and resolving doubts concerning the evidence in his favor, as we must, a reasonable jury could find Castillo intentionally abused his position as Leyva's supervisor, which gave him power to damage Leyva's interest in continued employment with MPA. Thus, Leyva raised a triable issue of fact whether Castillo's conduct was extreme and outrageous, and the trial court erred in granting summary adjudication of Leyva's intentional infliction of emotional distress claim.

F.  *Leyva Raised a Triable Issue of Fact as to His Punitive Damages Claim*

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff . . . may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct

34

which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Id.*, subd. (c)(1).) Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id.*, subd. (c)(2).)

Defendants moved for summary adjudication of Leyva's punitive damages claim based on the lack of evidence Castillo or Schooner engaged in, authorized, or ratified any act of fraud, oppression, or malice. In his opposition brief, Leyva argued he raised triable issues whether Castillo's and Schooner's conduct could support an award of punitive damages. The trial court ruled the issue was moot based on its other rulings.

On appeal, Leyva argues summary adjudication of his punitive damages claim was error, contending his claim may be premised on his FEHA, CFRA, and wrongful termination claims. Defendants renew their argument Leyva lacks evidence Castillo's or Schooner's conduct constituted oppression or malice.[15] Again, Leyva has the better argument.

---

[15] Defendants also argue for the first time on appeal Leyva lacks evidence Castillo or Schooner was an officer, director, or managing agent of MPA. Because defendants failed to make this argument in the trial court, they have forfeited the contention. (*Pittman v. Beck Park Apartments Ltd.* (2018) 20 Cal.App.5th 1009, 1026 [an argument ""may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it""]; *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 972 [""[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.""].)

A reasonable jury could conclude Castillo and MPA intentionally discriminated against Leyva by terminating him for taking time off to care for his disabled father, but they attempted to hide the illegal reason for their decision with a false explanation, thus denying Leyva of his protected rights under FEHA and CFRA. (See *Rubio v. CIA Wheel Group* (2021) 63 Cal.App.5th 82, 98 ["Evidence that an employer offered a pretextual explanation to justify its wrongful termination may support a finding of malice or oppression."]; *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 ["Evidence that the decision-maker attempted to hide the improper basis with a false explanation . . . supports the jury's determination that the conduct was willful and in conscious disregard of [employee's] rights."].) *Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, relied on by defendants, is distinguishable. There, the employer admitted it had terminated the director of a preschool for informing the parents of a prospective student that the school had no room for their child. The jury awarded punitive damages, finding the reason for the termination violated the public policy of protecting children by maintaining required staffing ratios. (*Scott*, at pp. 714-715.) The Court of Appeal reversed the punitive damages award, reasoning that terminating an employee for an improper reason without more does not support a finding of despicable conduct. (*Id*. at p. 716.) In contrast, as discussed, Leyva raised a triable issue of fact whether MPA's proffered legitimate reason for Leyva's termination was pretext. A jury could reasonably find that defendants' discriminatory conduct was deceitful and therefore malicious or oppressive. Thus, the trial court erred in granting summary adjudication of Leyva's claim for punitive damages.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The trial court is ordered to vacate its order granting defendants' motion for summary judgment and to enter a new order granting summary adjudication as to Leyva's fourth cause of action for CFRA retaliation and denying summary adjudication as to Leyva's remaining causes of action. The matter is remanded for further proceedings consistent with this opinion. Leyva is entitled to recover his costs on appeal.

FEUER, J.

We concur:

SEGAL, Acting P. J.

ESCALANTE, J. *

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.